IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

YOLANDA C. FLORES,

      Plaintiff,

vs.                                                                                         No.  06cv0869 DJS

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MEMORANDUM OPINION

**THIS MATTER** is before the Court on Plaintiff's (Flores') Motion to Reverse or Remand Decision of the Commissioner **[Doc. No. 8]**, filed January 22, 2007, and fully briefed on February 28, 2007.  On August 12, 2005, the Commissioner of Social Security issued a final decision denying Flores' claim for disability insurance benefits and supplemental security income payments.  Flores seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

## I.  Factual and Procedural Background

Flores, now fifty-three years old (D.O.B. January 27, 1954), filed her application for disability insurance benefits and supplemental security income payments on August 22, 2003 (Tr. 16), alleging disability since July 15, 2002 (*Id.*), due to depression, panic disorder, and

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this action.

anxiety (Tr. 140).  Flores completed the tenth grade in high school and has past relevant work as a crew leader at a laundry facility and as a head maid in a motel.  Tr. 13, 118.  On August 12, 2005, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Flores was not disabled as she retained the residual functional capacity (RFC) to perform light work and thus could perform her past relevant work.  Tr. 21.  The ALJ further found Flores' allegations regarding her limitations [were] not totally credible. *Id.*  Flores filed a Request for Review of the decision by the Appeals Council.  On August 4, 2006, the Appeals Council denied Flores' request for review of the ALJ's decision.  Tr. 6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Flores seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well

as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). The court "may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Flores makes the following arguments: (1) the ALJ erred in concluding she did not have a physical or mental impairment imposing additional and significant work-related limitation of functioning as required by Listing 12.05C; (2) the ALJ erred in rejecting her I.Q. scores and in her analysis of whether she suffered deficits in adaptive functioning; (3) the ALJ erred in finding she did not meet Listing 12.05C; (4) and the ALJ erred as a matter of law in failing to consider the effect of her mental impairments of depression, panic attacks, and borderline intellectual functioning on her residual functional capacity.

**A. Listing 12.05**

Flores contends the ALJ erred in finding at step three of the sequential evaluation process that she did not meet Listing 12.05C.

Listing 12.05 states in relevant part:

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[2]

---

[2] This is what is commonly referred to as the "capsule definition" for this listing and is addressed in Listing 12.00A. Listing 12.00A states in pertinent part: "The structure of the listing

>   The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>   . . .
>
>   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitations of function[.]

20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.05C.

Under Tenth Circuit law, a claimant's burden under Listing 12.05C is twofold: (1) "[a] valid verbal, performance, or full scale IQ of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function." *See, Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997). A "significant limitation" of function for purposes of 12.05C is one that has more than a slight or minimal effect on the claimant's ability to perform basic work" and "need not be disabling in and of itself." *Id.* at 1352. Thus, "the §12.05C limitation is significant if the claimant suffers from a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function." *Id.* at 1352-53.

Flores contends the ALJ erred in rejecting her I.Q. scores and in her analysis of whether she suffered deficits in adaptive functioning. Pl.'s Mem. In Support of Mot. To Remand at 9-10. Specifically, Flores contends "the Commissioner committed legal error by requiring a diagnosis of mental retardation in order to find that [her] impairment satisfied the requirements of section 12.05C of the Listing of Impairments." *Id.* at 10.

---

for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.00A. **In addition to meeting this capsule definition, a claimant must also meet one of the four severity prongs for mental retardation as listed in the regulations**. *Id.*; *see also Lax*, 489 F.3d at 1085.

In her decision, the ALJ relied on Cherylee S. Tombaugh's Educational Diagnostic Evaluation to reach her conclusion that Flores did not meet Listing 12.05C. Cherylee S. Tombaugh, a Certified Educational Diagnostician, administered the Wechsler Adult Intelligence Scale-III which was designed as a measure of general intelligence for adults. Tr. 275. Ms. Tombaugh found, in pertinent part, as follows:

> **EXCEPTIONALITY**:
>
> Based on Yolanda's performance during this evaluation, Yolanda exhibits evidence of a *Mental Deficiency*. However, from the daily living skills she can perform, a diagnosis of *Mental Retardation* cannot be accurately defined.
>
> **RECOMMENDATIONS:**
>
> 1. Yolanda should be able to successfully work in an area where she is shown how to perform a task and is carefully supervised.
>
> 2. Yolanda should be able to work in housekeeping in a motel/hotel business, a cleaning person in a cleaning business or as a cook in a restaurant or any other job that will not require her to read, write or compute math.
>
> 3. Yolanda may be able to find work through TRESCO or any other organization that works with the mentally deficient.

Tr. 277 (emphasis in original).

In finding that Flores did not meet Listing 12.05C, the ALJ found:

> The undersigned has considered the representative's argument that the claimant has an impairment that meets Section 12.05C of the Listing of Impairments but disagrees with this assumption. Psychological test scores submitted are based on the Wechsler Adult Intelligence Scale III evaluation performed upon referral by the Department of Vocational Rehabilitation's to Tombaugh Educational Diagnostics. The claimant attaned Full Scale IQ 60; VIQ 61 and PIQ 67. Although these scores are considered low, the examiner Cherylee S. Tombaugh concluded the claimant could not be diagnosed was mentally retarded because of the claimant's confirmed daily living skills. Also the claimant has a valid driver's license and continues to drive three times per week. She is also able to care for her personal needs and perform housework. In as much as the record does not support the claimant has a physical or mental impairment imposing additional and significant work-related limitation of functioning the criteria of 12.05 "C" of the Listing of Impairments is not met or equaled (Exhibit 12F).

Tr. 18 (emphasis added).

Under the regulations, "[t]he results of standardized intelligence tests may provide data that help verify the presence of mental retardation . . . as well as the extent of any compromise in cognitive functioning." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.00C6 (Intelligence tests). Significantly, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.*

In this case, Ms. Tombaugh did not find the IQ scores valid based on "the daily living skills [Flores] [could] perform." Tr. 277. Flores also acknowledged the ALJ found the scores "contradicted by everything in the file." Pl.'s Mem. In Support of Mot. To Remand at 10. At the administrative hearing, Flores' counsel argued Flores met Listing 12.05C. In rejecting this argument the following colloquy between the ALJ and Flores' counsel took place:

ATTY: I think we were working at this from the direction of 12.05C. That she has –

ALJ: Right. And I, and I, and I saw the testing with the IQ score. And you know, I, I can't explain the, the tests, the results of the tests. But I think that that's contradicted by everything in the file. I think it's just completely out of context. Nearly every page in the file contradicts that. She not only had jobs and was working. She did well at them. She put her– when she listed her work, she put not just laundry, but leader, crew leader. Not just maid, but head maid. The other of the reports in the file talk about excellent verbal skills. There's not one page in the '98, '99 records that indicate a problem. And the, the test scores showed two deviations below the norm. That's, that's a striking deficiency. The other discussions by the mental health workers talk about average fund of knowledge.

7

> Average intelligence skills.  I don't think you can talk to someone that legitimately scored what these scores came out and, and not no (sic) effect.  In fact, I have in the past totally disregarded a psychiatrists consultative evaluation because she thought that the individual was of average intelligence.  And three different sets of testing showed the, the individual was mentally retarded.  So I thought the psychiatrist had not been attentive or spent enough time with the person.  In this case, we have social workers and mental health workers that saw Ms. Flores repeatedly, and, and not only didn't [note] the mental deficiency, encouraged her to get a GED and believed she was going to get a GED.  You can pursue that certainly with any line of questions you want to.  But I just, I think even the person that did the test said they could not conclude from that that there was indeed a mental retardation because it was contradicted by the activities of daily living and the personal history.  If you want to go ahead with questions and you know, see where that might support your opinion, go ahead.

Tr. 351-352.  In determining whether Flores' IQ scores were valid it was proper for the ALJ to consider evidence in the record, *see Lax*, 489 F.3d at 1087, and the record contains substantial evidence to support a finding that Flores' IQ scores were not an accurate reflection of her intellectual capacities.  *See e.g.* Tr. 90 (Work History Report– crew leader in laundry facility from 9/89 to 8/96; head maid in motel from 5/80 to 6/82; seamstress at Legg's factory– 6/75-8/79).

      The clinical notes from Southwest Counseling Center, Inc. also support a finding that Flores' IQ scores were not an accurate reflection of her intellectual capacities.  On **August 26, 1999**, the registered nurse noted Flores' intellect was average and her thoughts were logical,

coherent, and goal oriented. Tr. 181.[3]  The registered nurse also noted Flores was in for a medication check and was doing better.  On that day, Flores denied depression, reported no crying spells, her sleeping her improved, and her anxiety and mood swings had decreased.  *Id.*  After this date, August 26, 1999, Flores failed to return for treatment; therefore, on **April 29, 2002**, Dr. Barry Hughes discharged her and closed her file.  Tr. 180.

Additionally, the record indicates that in the **December 30, 1998** Disability Report Adult, Flores reported she was wrongfully fired from her job as a crew leader with American Linen because she filed a lawsuit against her employer alleging sexual harassment.  Tr. 75.  This contradicts Flores' claim to Ms. Tombaugh that she was fired because she could no longer perform her job (Tr. 274).  See also Tr. 186 ("Lawsuit and settlement are still pending in Albuquerque regarding sexual harassment charges she brought against her former employer).  Flores worked at American Lines for 7 ½ years and reported she supervised other co-workers.  Tr. 76; *see also* Tr. 91 (supervised 6 employees ½ of her working time).  Flores reported she operated a "machine called the shirt unit and press machines." Tr. 91.  In her December 1998 Disability Report, Flores also listed depression, anxiety, and panic disorder with agoraphobia as the impairments or conditions that limited her ability to work.  Tr. 75.  Flores included a statement alleging she was "illiterate" and could not read or write English and "read numbers backwards."  Tr. 82.

---

[3] *See also* Tr. 182 (July 28, 1999 follow up visit with R.N.– average intellect); Tr. 183 (June 17, 1999 follow-up visit with R.N.– average intellect); Tr. 184 (May 26, 1999 follow up visit with R.N.– average intellect); Tr. 187 (April 30, 1999 follow up visit with R.N.– average intellect); Tr. 190 (April 16, 1999 Medical Doctor Follow Up Note– average intellect, logical, coherent, goal oriented); Tr. 196 (March 19, 1999 follow up visit with R.N.– average intellect); Tr. 199 (March 5, 1999 Medical Doctor Follow Up Note– average intellect); Tr. 201 (Adult Outpatient Progress Note– "started college to get her GED"); Tr. 204 (February Treatment Record notes by social worker– "Went in and took GED prep test to be able to sign up for classes.").

Prior to completing the December 1998 Disability Report Adult, Flores completed a Disability Supplemental Interview Outline on **December 17, 1998**.  Tr. 84-89.  In this outline, Flores reported that prior to being on her medication for her anxiety and depression she used "to be out visiting family or shopping with friends" and "did not need help making dinner."  Tr. 84.  Notably, Flores reported "because of [her] medication [her] daughter comes over to clean my house and wash my laundry" because [she] "get[s] really dizzy when [she] moves around the house a lot so [she] need[s] [her] family to help [her].  Tr. 86.

On **January 4, 1999**, Flores completed a Work History Report.  Tr. 90-97.  Flores reported she worked at American Linen and used "a machine called the shirt unit and press machines and sometimes I was in charge of other workers."  Tr. 91.  Flores claimed she spend ½ her working time supervising 6 employees.  As a head maid, Flores reported she supervised three employees ½ of her working day.  Tr. 92.

Flores also contends her school records "reveal a preponderance of grades of 'D' obtained throughout elementary and secondary school" and "F's in English and Civics" in secondary school.  Pl.'s Mem. In Support of Mot. To Remand at 15.  However, Flores' school records also indicate an IQ of 76 and C's in English, Social Studies, and Reading in School Year 1967-68.  Tr. 149.  Moreover, although Flores reported she was in Special Education, her school records indicate she was mostly in regular classes.  *Id.*  Significantly, Flores never considered herself to be mentally retarded, rather, she described herself to be illiterate.  Tr. 82 ("I wanted to add that I am illiterate.  I cannot read or write english (sic), I can read small words that's all."); Tr. 238 ("reported illiteracy").  In addition, Flores requested assistance in "getting her GED."  *Id.* ("When I do get better I would like to go back to work but I would also like to get a good job

and in order for me to do that I feel that I need some sort of training like getting my GED first, that is really important to me.").

Based on the foregoing, the Court finds that "it was proper for the ALJ to consider other evidence in the record when determining whether [Flores'] IQ scores were valid." *See Lax*, 489 F.3d at 1087. Moreover, the record contains substantial evidence to support a finding that Flores' IQ scores were not an accurate reflection of her intellectual capabilities.

The ALJ also found "the record does not support the claimant has a physical or mental impairment imposing additional and significant work-related limitation of functioning" and thus concluded Flores did not meet the criteria of Listing 12.05C. As previously noted, Flores had to meet the capsule definition of Listing 12.05C and, in addition, Flores had to meet one of the four severity prongs for mental retardation as listed in the regulations. In this case, Flores had to show "a valid verbal, performance, or full scale IQ of 60 through 70 **and** a physical or other mental impairment imposing an additional and significant work-related limitation of function." The Court already found the ALJ's findings regarding Flores' IQ were proper and supported by substantial evidence. However, the ALJ erred in finding that Flores did not have an "other mental impairment" imposing an additional and significant work-related limitation of function. By finding at step two that Flores had major depression and panic attacks, impairments that were severe, the ALJ should have found that these mental impairments were significant under Listing 12.05C. *Hinkle v. Apfel*, 132 F.3d at 1352-53 ("a decision regarding whether a claimant has a §12.05C 'significant limitation' should 'closely parallel' the step two standard . . . .").

Nonetheless, the Court finds this error to be harmless. Under a harmless error analysis, the Court may affirm an ALJ's decision - despite an ALJ's error at step three- "when confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three

determination under review." *Fischer-Ross*, 431 F.3d 729, 734 (10th Cir. 2005). "Those findings must 'conclusively preclude Claimant's qualification under the listings at step three' such that 'no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'" *Id*. at 733-34, 735 (citations omitted). Because Flores did not have "a valid verbal, performance, or full scale IQ of 60 through 70," a finding by the ALJ that Flores' depression and panic attacks imposed "an additional and significant work-related limitation of function" would not have changed the ALJ's finding that Flores did not meet Listing 12.05C. Finally, because Flores failed to meet one of the severity prongs of Listing 12.05C, the ALJ did not need to consider whether Flores met the capsule definition. *Lax,* 489 F.3d at 1089 ("Because we have concluded that Lax failed to meet one of the severity prongs, we need not consider whether he met the capsule definition.").

## B.  Step Four of the Sequential Evaluation Process

Flores contends the ALJ erred in failing to consider the effects of her mental impairments of depression, panic attacks, and borderline intellectual functioning on her residual functional capacity (RFC). Pl.'s Mem. In Support of Mot. To Remand at 17. Specifically, Flores alleges "Dr. Schutte found she had moderate limitations in her ability to understand and remember detailed or complex instructions, work without supervision, and to use public transportation or travel to unfamiliar places." *Id.* at 18.

In her decision, the ALJ found:

The undersigned must now determine whether the claimant retains the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 CFR §§404.1545 and 416.945 and Social Security Ruling 96-8p).

In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p.  **The undersigned must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations** (20 CFR §§404.1527 and 416.917 and Social Security Ruling 96-6p).

The issue of credibility is an integral part of the decision-making process.  In the instant case, the undersigned has considered the objective medical evidence and the claimant's statements and testimony in arriving at the following decision.  **The evidence of record establishes the existence of non-exertional limitations associated with affective and anxiety-related disorders and borderline intellectual functioning**.  There is presently no evidence supporting the existence of any physical limitations to preclude a return to past relevant work.

The Southwest Counseling Center's records cover a period beginning October 1998 when the claimant was initially treated for depression.  She was initially treated and continued treatment through August 1999 when it was reported that she was "doing better".  The claimant's case was terminated for non-compliance in that same month.  The record further shows treatment resumed in April 2004 and once more a pattern of missed appointments was established ultimately resulting in the case closure in December 2004.  A termination summary issued on February 24, 2005 shows the claimant failed to follow treatment regimen.  **At that time the claimant's level of functioning was given a GAF score of 60. The "mild" symptoms corresponding with this score imposes no significant functional limitations in the work-place** (Exhibits 5F, 13F).

At the request of the Administration, the claimant underwent a consultative psychological evaluation perform[ed] by James W. Shutte, PhD.  The mental status examination revealed no significant functional limitations as she was reportedly oriented with cognition grossly intact.  **Attention and concentration was considered in the normal range and the claimant did not display gross deficits in memory despite her allegations to the contrary during her testimony**.  **However it is further noted by the examiner the claimant exhibited an adequate ability to communicate and understand the English language**.  The foregoing corresponds to Dr. Shutte's and Ms. Tombaugh's opinions that **the claimant retained the ability to follow simple instructions and tasks when given orally thereby permitting the performance of work activity at some level in the economy** (Exhibit 7F, 12F).  Neither examiner's narrative statement viewed the claimant as incapable of work activity, a finding that is consistent with the undersigned's assessment.

**The DDS medical consultant diagnosed the claimant with major depression and anxiety with the following functional limitations: "no" limitations in daily activities; "mild" limitations in social interaction; "moderate" limitations in concentration and "no" evidence of episodes of deterioration** (Exhibit 8F).

At the hearing the claimant testified that she is "disabled" because she cannot read English. She further asserted that in her past job as a hotel maid her superiors advised that she needed to write, to order supplies and to have computer skills.  Additionally, in the performance of job duties as a laundry worker she was advised that reading skills were needed.  Although

> the claimant alleges being unable to work because of lack of reading and writing skills, this conclusion is not supported by the evidence of record. **According to the diagnostician's opinion, even with reported limitations in reading or writing the claimant is considered capable of working as a housekeeper in a hotel or motel, as a cleaning person, or even as a cook. According to Ms. Tombaugh, the claimant is capable of performing jobs of this nature as the ability to read, write or compute math are not an essential element of the job duties (Exhibit 12F). Moreover, this opinion is essentially consistent with that of consultative psychologist Dr. Shutte and also concurred by the undersigned.** Accordingly, the undesigned finds the claimant retains the following residual functional capacity: light work.

Tr. 18-20 (emphasis added). The ALJ noted and concurred with Ms. Tombaugh's assessment that Flores had the ability "to successfully work in an area where she is shown how to perform a task, and is carefully supervised." Tr. 277. Based on this assessment, Ms. Tombaugh opined Flores "should be able to work in housekeeping in a motel/hotel business, a cleaning person in a cleaning business or as a cook in a restaurant or any other job that will not require her to read, write or compute math." *Id.* Dr. Shutte also found Flores could follow simple instructions if given orally, could carry out simple tasks, could engage in leisure activities, enjoyed listening to music and exercising, could go out by herself, and could speak and communicate effectively. Tr. 237. In addition, Dr. Shutte found Flores' "cognitive functions" grossly intact and her attention and concentration were within normal limits. *Id.*

Thus, the ALJ's decision indicates she considered Flores' nonexertional limitations. The Court has meticulously reviewed the record and finds that the ALJ's RFC determination is supported by substantial evidence. Moreover, Dr. Schutte's finding that Flores had moderate limitations in her ability to understand and remember detailed or complex instructions or Flores' inability to use public transportation would not preclude Flores from working "as a laundry "crew leader" or as a "hotel maid." Tr. 20

14

**D.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**